IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

UNITED STATES OF AMERICA

v.

IGOR GOLDENSHTEIN and
EDWARD AKSELROD

CRIMINAL CASE NO.

1:10-CR-00323-TCB-RGV

## MAGISTRATE JUDGE'S FINAL REPORT AND RECOMMENDATION

Defendants Igor Goldenshtein ("Goldenshtein") and Edward Akselrod ("Akselrod"),[1] are charged in a two-count indictment with conspiracy and possession with intent to distribute less than fifty kilograms of marijuana, a Schedule I controlled substance, in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(D), and 846. [Doc. 17 at 1]. Goldenshtein has moved to suppress all evidence and statements arising from a July 19, 2010, traffic stop in which he was the passenger in a vehicle driven by Akselrod. [Doc. 30]. Akselrod has also moved to suppress all evidence seized during the traffic stop, [Doc. 37], as well as evidence seized during a subsequent search of his residence on grounds that the search warrant for his residence was obtained using fruit of the unlawful traffic stop. [Doc. 36]. Following an evidentiary hearing on the motions, the parties have briefed the issues raised by

---

[1] Hereinafter collectively referred to as "defendants."

the motions, [Docs. 56, 59, & 60], and the matter is now ready for ruling.[2]  For the

following reasons, the undersigned Magistrate Judge **RECOMMENDS** that

defendants' motions to suppress evidence and statements, [Docs. 30, 36, & 37], be

**DENIED**.[3]

## I.  STATEMENT OF FACTS

### A.     Preliminary Investigation

On July 19, 2010, Special Agent Kenneth Martinson ("Agent Martinson") of

the United States Immigration and Customs Enforcement agency ("ICE") received

notification from the Customs and Border Protection Air Marine Operations Center

that a Cessna 400 aircraft, with tail number N912AV, associated with California

Flight Center,[4] was enroute from Amarillo, Texas, to the Atlanta, Georgia, area.[5]  (Tr.

---

[2] See Doc. 54 for the transcript of the evidentiary hearing.  Citations to the evidentiary hearing transcript hereinafter will be referred to as "(Tr. at ___)."  In addition, the government submitted exhibits at the October 29, 2010, hearing, which will be referred to as "(Gov. Ex. ___)."

[3] Akselrod has also filed a motion for a bill of particulars, [Doc. 38], which is **GRANTED** in part and **DENIED** in part, for the reasons stated hereinafter.

[4] Agent Martinson testified that California Flight Center is an aircraft rental and pilot training center based at the Hawthorne Airport in Long Beach, California. (Tr. at 8).  He testified that California Flight Center uses primarily small, single or twin engine 4-6 seat Cessna general aviation aircraft.  (Tr. at 8-9).  The aircraft in this case was one of the aircraft listed for rental on the California Flight Center website. (Tr. at 9, 11).

[5] Agent Martinson, who is based in Los Angeles, California, testified that he had been with ICE since 2006, and prior to that had been a Federal Air Marshal and

at 10-11).  Agent Martinson determined that the aircraft had originally departed from Hawthorne Airport in California, and had stopped in Amarillo to re-fuel.  (Id.). Based on the fuel purchase records from Amarillo, Agent Martinson determined that Goldenshtein was the pilot of the aircraft.  (Tr. at 11-12).  Agent Martinson investigated Goldenshtein's background and determined that he had previously piloted a Diamond Star DA42 twin engine aircraft, tail number NT457TS, from Los Angeles to the Atlanta area in May of 2010.[6]  (Tr. at 12, 23-24).  He determined that the same aircraft had made a trip to the Atlanta area three weeks later.[7]  (Id.).  Agent

---

a Border Patrol agent.  (Tr. at 6-7).  He testified that he had training and experience with aviation narcotics smuggling investigations, as well as basic pilot's training. (Tr. at 7-8).  Based on two prior interdictions of California Flight Center aircraft in October of 2008 and June of 2009, Agent Martinson testified that he had requested notification from the Air Marine Operations Center if any California Flight Center aircraft were encountered on long-distance flights outside of California.  (Tr. at 11). Agent Martinson testified that he had "only encountered one other flight school since [he had] been investigating [narcotics smuggling] that has had such a high incidence of narcotics seizures or interdictions associated with it."  (Tr. at 10).

[6] Other investigation of Goldenshtein's background and history revealed that he had no criminal history and no narcotics-related activity aside from indicating on his Facebook profile that he "liked" a medical marijuana collective named "The Ballast Collective" based in Long Beach, California.  (Tr. at 15).

[7] Though Agent Martinson was unable to determine at the time who was piloting the aircraft on the second trip to Atlanta in June of 2010, in light of similar trips in May and July of 2010 by Goldenshtein, he thought Goldenshtein could have been the pilot of the June, 2010 flight as well.  (Tr. at 12-13).  Agent Martinson explained he could not determine this information because he could only query records by aircraft, not by pilot, and that pilots keep their own records.  (Tr. at 24).

Martinson characterized the May and June flights as "quick turn" flights, indicative of smuggling activity.[8]  (Tr. at 13-14).  Agent Martinson was not able to determine at the time Goldenshtein's aircraft was en route to Georgia whether that flight would be a "quick turn," however, because he had no way of knowing at that time when the aircraft would return.  (Tr. at 14).

Agent Martinson testified that, in the interdictions he was familiar with, narcotics smuggled on aircraft were normally stored in "duffle bags, general luggage, pilot bags."  (Tr. at 15).  In his prior interdictions of marijuana,  "the number of bags was excessive compared to the number of people on board the aircraft."  (Id.).  He further explained that a plane as small as the Cessna 400 that Goldenshtein was flying required the pilot to pay careful attention to the weight and balance of luggage being transported, and that large amounts of weight would impact fuel consumption and performance.  (Tr. at 33).  He testified that it would be

---

[8] Agent Martinson explained that "quick turn" flights were those in which the pilot flies from one point to another, stays a very short time, then immediately returns to the point of origin.  (Tr. at 13).  Agent Martinson said that normally only charter flights made a quick turn because pilots seeking flight hours for training or certification purposes would attempt to make multiple, short-distance flights to different airports under different conditions to receive "a broader range of experience from the flights."  (Tr. at 13-14, 23).  He determined that the aircraft at issue in this case was not registered for charter flights, and that Goldenshtein was not qualified to fly charter flights.  Agent Martinson also said that "quick turns were similar in profile to other flights that [he] had either directed the interdiction of or [was] aware of the interdiction of narcotics."  (Id.).

unusual for a single pilot in general aviation to have a large amount of luggage for this reason, and that "if you are a pilot and you are going from one place to another, you pack light because you've got to make up that weight somewhere."  (Tr. at 34).

Agent Martinson contacted ICE Special Agent Bruce Busby ("Agent Busby) of the Atlanta Division, with whom he had worked on previous aircraft narcotics smuggling investigations.[9]  (Tr. at 16).  Agent Martinson requested that Agent Busby conduct surveillance of the aircraft when it landed, and told him Goldenshtein's approximate time of arrival as well as the information he had gathered so far regarding Goldenshtein's "like" of The Ballast Collective, his flight history, the flight profile, and the association between Goldenshtein and the Diamond Star aircraft. (Tr. at 16-17).  Agent Martinson remained in contact with Agent Busby up until the landing of the aircraft.  (Tr. at 17).  Agent Busby ran his own records check of

---

[9] Agent Busby testified that he had been with ICE since 2006, and was assigned to investigate money laundering, drug trafficking, and immigration violations. (Tr. at 36).  Prior to joining ICE, Agent Busby was with the United States Border Patrol for fourteen and a half years, and with the Savannah Police Department for six and a half years. (Id.).  Agent Busby testified that he had training and experience conducting narcotics investigations with the Border Patrol and with ICE, and that he had participated in two prior aircraft narcotics smuggling investigations in Atlanta: one of which involved a similar investigation in which Agent Martinson had alerted him to surveil and interdict an incoming flight involving a plane with a history of "quick turnaround" flights from California to Atlanta. (Tr. at 36-38). Agent Martinson also testified that he and Agent Busby had previously investigated a case involving an aircraft transporting marijuana from Los Angeles to Atlanta using "the I-40 corridor."  (Tr. at 16).

Goldenshtein and confirmed that he had no criminal history, though he did find an entry in the U.S. Customs database that indicated Goldenshtein had attempted to cross the border from Canada to the United States with a 9mm handgun.  (Tr. at 39). The record showed that Customs had seized the handgun without charging Goldenshtein.  (Id.).  Agent Busby also confirmed that The Ballast Collective was a medical marijuana group, though due to his unfamiliarity with Facebook, he was unable to confirm Goldenshtein's "like" of the group.  (Tr. at 38-39).

Due to the possibility that Goldenshtein might be armed, as well as the fact that the ICE agents were conducting covert surveillance, Agent Busby decided to ask for assistance from uniformed officers of the DeKalb County Police Department ("DCPD").  (Tr. at 39, 178-79).  Agent Busby called several other ICE agents and task force officers and arranged a "briefing" at around 10:30 p.m. at a restaurant located near the runway of the Peachtree-DeKalb airport.  (Tr. at 39-40, 53).  Agent Busby, ICE Special Agent Alejandro Ascencio ("Agent Ascencio"),[10] as well as other ICE Special Agents and Task Force Officers, including Harold Christian ("Officer

_____

[10] Agent Ascencio testified that he had been working for ICE since 2006 and that at the time he was working for the financial group, specializing in drug smuggling, money laundering, and financial cases.  (Tr. at 68).  Prior to working for ICE, Agent Ascencio was a police officer with the Statesville Police Department in North Carolina, where he was assigned to Customs to work on narcotics cases.  (Id.). Agent Ascencio testified that he had supervised "numerous narcotics investigations" and had done "hundreds of [undercover] meetings."  (Id.).

Christian"),[11] attended the briefing, as did DCPD Lieutenant Doug Wilson ("Lt. Wilson"), and DCPD officers Kris Laird ("Officer Laird")[12] and Robert Summe ("Officer Summe").[13]  (Tr. at 39-40, 52-53, 69, 77, 100-01, 169, 178-79).  Agent Busby relayed the information he knew from Agent Martinson to the other agents present regarding the airplane and the possibility that it might have contraband on board. (Tr. at 40, 53, 69).  Up to the time of the traffic stop, Agent Busby continued to serve as the coordinator and leader of the investigation, and as liason between ICE agents

_____

[11] Officer Christian testified that he was employed by the Kennesaw Police Department, but had been assigned to an ICE task force for the past "five or six years" to investigate money laundering.  (Tr. at 49).  Prior to being employed with the Kennesaw Police Department, Officer Christian was with the Atlanta Police Department for thirty-two years, having been assigned to robbery, homicide, and uniformed patrol.  (Id.).  Officer Christian had prior experience investigating aircraft narcotics smuggling, and testified that in a prior case in August of 2009, he had seen three smugglers unload six heavy bags which they would instruct the airport ramp agents not to touch, despite giving them tips, and despite apparently "struggling" with one heavy bag.  (Tr. at 50-51).  In that case, two of the bags contained ordinary luggage, and four of the bags contained narcotics.  (Tr. at 51).

[12] At the time of the hearing, Officer Laird was employed by the City of Chamblee Police Department, having lateraled from DCPD in September, approximately a month before the hearing.  (Tr. at 74-75).  Officer Laird had worked for DCPD as a patrol officer since 2006, and had no prior law enforcement experience.  (Tr. at 75).  Officer Laird had received no specialized training in narcotics investigation beyond the standard training given to DCPD police officers. (Id.).

[13] Officer Summe testified that he attended the briefing at the airport, (Tr. at 122-23), and Agent Busby testified that he thought he remembered seeing Officer Summe there, though he wasn't sure.  (Tr. at 42, 178).

7

and the DCPD uniformed officers.[14]  (Tr. at 40-41).  In this capacity, Agent Busby remained at the restaurant,[15] was not present when the plane landed, and did not directly observe the traffic stop or events leading up to the traffic stop.  (Id.).

## B.    Surveillance of Defendants at the Airport

Officer Christian was assigned to observe and video-record[16] the airplane on the runway and to report his observations by radio to the other officers.  (Tr. at 53, 59-60).  He was driving a black, unmarked Chevrolet Sierra pickup truck, which he parked at the end of the runway prior to Goldenshtein's arrival.  (Tr. at 53-54).  Agent Ascencio was assigned to accompany Officer Christian to the parking area near the terminal, but he parked six or seven car lengths away from Officer Christian, who parked closer to where the plane would actually taxi to a stop.  (Tr. at 69-70).  While Officer Christian was parked and waiting for the plane, one of the airport ramp agents, Jeremy Tolbert ("Tolbert"), contacted Officer Christian and

---

[14] Agent Busby testified that Lt. Wilson remained in the restaurant parking lot with him and "deployed his guys, they were going different places."  (Id.).  Lt. Wilson remained in contact with ICE agents through Agent Busby, and with DCPD police officers via radio.  (Tr. at 77).

[15] Agent Busby testified that the restaurant was located at the end of the airport runway.  (Tr. at 41).  He said he could see the runway from where he was located, but did not see Goldenshtein's plane land.  (Id.).

[16] The video recording of the plane landing and being unloaded was admitted as Gov. Ex. 3 and played at the hearing.

asked what he was doing there.  (Tr. at 54).  Officer Christian told Tolbert what he was doing, and who he was waiting for, and Tolbert told Officer Christian that he would position Goldenshtein's airplane in front of Officer Christian's truck after it landed.  (Id.).  Goldenstein's plane landed, and Tolbert directed the plane to park directly in front of Officer Christian's truck, with the wing-tip of the plane approximately 20 feet from the front of the truck.  (Tr. at 54-55, 70).

Officer Christian saw Goldenshtein, who was the pilot and only occupant, exit the airplane, turn off the airplane lights, talk to the ramp agent for a short time, then begin walking toward the airport's main building.  (Tr. at 55).  Goldenshtein picked up his cell phone, and began looking around the parking lot.  (Tr. at 55, 61; Gov. Ex. 3).  He then went inside the building, and came out three to five minutes later.  (Tr. at 55, 61; Gov. Ex. 3).  At that time, a Ford Focus, driven by Akselrod, pulled into the airport, and parked near the airplane.  (Tr. at 55, 61; Gov. Ex. 3).  Goldenshtein opened the car door, took a bag out of the car's front passenger seat, and placed it into the back seat.  (Tr. at 56).  He then opened the trunk of the car, went back to the plane, and removed two bags from a cargo compartment, and loaded those bags into the trunk of the car.  (Id.).  Akselrod took two additional bags from the airplane cargo compartment and loaded those into the trunk as well.  (Tr. at 56-57, 61-62; Gov. Ex. 3).  Goldenshtein then opened the front passenger door of the plane,

handed one bag to Akselrod, which Akselrod placed in the back seat of the car, and took one bag himself from the front passenger seat of the plane to the rear seat of the car.  (Tr. at 56, 61-62; Gov. Ex. 3).  Officer Christian testified that there were a total of seven bags transferred from the plane to the car, one of them being a "flight bag" carried by Goldenshtein.  (Tr. at 57).

Officer Christian testified that the first four bags loaded into the trunk were "twenty, twenty-four inches by maybe eighteen inches tall."  (Id.).  He described one bag as looking "like it was a laundry bag with a pull string top."  (Id.).  Another bag, the fifth one unloaded, looked like a "suit bag, a garment bag."  (Tr. at 58).  However, "instead of being flat, it was bulky and it took [Akselrod] both of his hands . . . to carry that bag."  (Id.).  Officer Christian said that none of the bags unloaded looked "like a luggage bag, clothing, something that [he] would carry when [he] would go out of town.  Everything seemed to be utility bags or duffle bags."  (Id.).  When other officers asked over the radio what he believed was in the bags, Officer Christian said he didn't think it was cocaine or money, but was something lighter, and possibly marijuana.  (Tr. at 62).

Officer Christian testified that the large number of bags for only one occupant was significant to him in view of the weight and balance considerations with airplanes and because it was similar to his prior aviation smuggling case.  (Tr. at 58).

He also testified that though Tolbert and another ramp agent were present, they did not assist with unloading the bags.  (Tr. at 58-59).  Officer Christian said that the ramp agents "were just standing around," which he believed to be significant based on the fact that ramp agents in his prior aviation smuggling case were instructed not to touch any of the bags.  (Tr. at 59).

When the last bag was loaded, Goldenshtein handed the airplane keys to one of the ramp agents.  (Tr. at 63).  Goldenshtein then got into the car, and the car backed up directly behind Officer Christian's truck such that he was able to see the license plate number.  (Id.).  Goldenshtein and Akselrod then drove away in the car, followed at a distance by Agent Ascensio.[17]  (Tr. at 59, 64, 71).  Officer Christian estimated that the total time from the plane landing to the defendants' departure in the car was thirteen to fifteen minutes.  (Tr. at 59).  After Goldenshtein and Akselrod had left, Officer Christian asked Tolbert if there was anything unusual about the bags.  (Tr. at 64).  Tolbert said, "No.  They just wouldn't let me touch the bags." (Id.).

C.      **Traffic Stop**

Lt. Wilson informed Officer Laird prior to the start of Officer Laird's 10:00

---

[17] Officer Christian testified that he did not follow the defendants out of the airport because he had been so close to them.  (Tr. at 64).  Agent Ascencio testified that he followed directly behind the defendants' car, but at a distance he "tried to keep [at] about a hundred yards."  (Tr. at 71).

p.m. patrol shift that ICE "had information about a plane coming into Peachtree

DeKalb airport that may have a large amount of marijuana on it," and told him that

he needed to go to the airport to meet with agents to assist.  (Tr. at 76, 101).  While

en route to the airport, Officer Laird contacted Officer Summe, a K-9 handler with

a drug interdiction dog,  and related what he had been told by Lt. Wilson.[18]  (Tr. at

76, 121–22).  Officer Laird attended the briefing with ICE agents and other officers

where he was informed that a plane would be landing that possibly had marijuana

on board, and that one of the defendants had a prior arrest on a gun charge.[19]  (Tr.

---

[18]  Officer Laird thought that Officer Summe and his dog would be useful if
the ICE information about the marijuana turned out to be correct.  (Tr. at 76).  Officer
Summe testified that he had worked for DCPD for eight years, and had received
specialized training in narcotics investigation, and had participated in "a couple of
hundred" narcotics related investigations. (Tr. 113-14).  Officer Summe testified that
he had participated in other operations in which narcotics investigators would call
him and SWAT officers to stop cars coming out of the Peachtree-DeKalb airport that
were suspected of transporting narcotics or large amounts of money.  (Tr. at 125-26).
He said that it was notable that Goldenshtein's landing was at such a late hour due
to the fact that either the flight line or the control tower closed at 10:00 or 11:00 p.m.
(Tr. at 126).  Officer Summe had also received specialized training as a K-9 handler
along with his dog, Rocky.  (Tr. at 114-15).  Officer Summe testified that Rocky was
trained as a dual purpose dog in both apprehension and drug detection, and was
certified by a school in Holland as well as through the National Narcotics Detector
Dog Association.  (Tr. at 115-16).  Rocky was trained and certified in detecting four
base odors: heroin, meth, marijuana, and cocaine.  (Tr. at 116; Gov. Ex. 11).  The
defendants stipulated as to Rocky's qualifications as a narcotics detection dog.  (Tr.
at 119; Gov. Exs. 12 & 13).

[19] Officer Summe testified that Officer Laird said his Lieutenant told him to
meet him at the airport with ICE agents who had received information that some
marijuana was coming in through the airport.  (Tr. at 123-24, 145-48).  Officer

at 77-78, 101).  After the plane landed and ICE Agents put out a description of the

defendants' vehicle, Officer Laird and Officer Summe, who were both driving

marked DCPD police units, staged in a parking lot near the airport exit such that

they could see the defendants' vehicle turn onto Clairmont Road.[20] (Tr. at 77, 79-80,

_____

Summe further testified that an ICE agent at the airport said they needed assistance with stopping two individuals that might  be coming to the airport with 300 pounds of marijuana, (Tr. at 124, 145-47), and he was cross-examined at length on this point, and on other portions of his testimony that were inconsistent with the testimony of other officers.  (Tr. at 144-77).  Agent Busby testified that the information about two individuals flying in a plane with 300 pounds of marijuana pertained to one of his prior aircraft smuggling cases that he talked about with Lt. Wilson at the briefing as other officers were coming and going.  (Tr. at 178).  Though there are inconsistencies between Officer Summe's testimony and that of other officers, those inconsistencies are not material to the issue of whether there was a valid basis to stop the defendants' vehicle since the government is not relying on the contested points of Officer Summe's testimony to support the stop.  [Doc.  56 at 9 n.5 & 23-25].  Furthermore, though the defendants have attacked Officer Summe's veracity and credibility in open court and in their brief regarding these inconsistencies, see [Doc. 59 at 9 n.6], the Court does not find that Officer Summe's testimony was "perjurious" or that he "testif[ied] falsely under oath," as defendants contend, based solely on the fact that his testimony differed from others regarding certain details not material to the determination of the motions before the Court.  See Tayborn v. Scott, 251 F.3d 1125, 1131 (7th Cir. 2001) ("mere inconsistencies in the testimony of a government witness fall short of establishing that the government knowingly used false testimony"); Toole v. McNeil, No. 4:08cv241-MP/WCS, 2010 WL 5536340, at *7 (N.D. Fla. Nov. 4, 2010) ("Mere inconsistency of statements is not perjury, and not every inconsistent statement is material."), adopted by 2011 WL 43228 (N.D. Fla. Jan. 6, 2011).

[20] Though Officer Laird and Officer Summe's testimony differed with regard to how each of their vehicles were situated, both testified that they were parked in the parking lot adjacent to the airport exit with a view of the Clairmont Road intersection.  (Tr. at 79-80).  Officer Laird testified that he and Officer Summe were parked side by side in the parking lot, backed in between two buildings, and were

126).  Officer Summe testified that their plan was to wait for the ICE agents to give a description of the defendants' vehicle and to notify them that it was exiting the airport.  (Tr. at 125).  The officers would then get behind the defendants' vehicle, "find a probable cause to stop it, and then investigate the vehicle and persons inside it."  (Id.).

Agent Ascencio was following the defendants' car as it exited the airport and made a right turn onto Clairmont Road.  (Tr. at 71, 130-32).  At the time the defendants' car made the right turn onto Clairmont Road, Agent Ascencio testified that he was "about a hundred yards" behind it, and there were no vehicles between him and the defendants' vehicle.[21]  (Id.).  Agent Ascencio did not notice if Akselrod activated his turn signal before turning right, and could not recall if the light was red or green at the time Akselrod drove through the intersection.  (Tr. at 72).  He said the defendants' vehicle did not stop at the light, and that it "came to a slow crawl, but

---

having a conversation when the defendants' vehicle exited the airport.  (Tr. at 80).  Officer Summe testified that although he initially pulled beside Officer Laird's vehicle and had a conversation, (Tr. at 153), he eventually parked in a driveway of an office building, away from Officer Laird, and facing the intersection, (Tr. at 127).  Officer Summe testified that he and Officer Laird were not having a conversation at the time the defendants' vehicle turned onto Clairmont Road.  (Tr. at 153).

[21] Officer Summe testified that he saw a "gray pickup truck" about "ten yards" behind the defendants' vehicle as it approached Clairmont Road at the airport exit. (Tr. at 130, 155-57).

. . . just kind of went through the light."[22]   (Id.).  Agent Ascencio turned right to follow the defendants' vehicle onto Clairmont Road, at which time he pulled up to within "several car lengths behind it."  (Id.).  At this time, he saw the DCPD marked police units behind him, beside him, and coming "far away" from the opposite direction.  (Id.).

Officers Laird and Summe were told the make and model of the defendants' vehicle, that it was being followed by ICE agents, and that it had turned Northbound on Clairmont Road.  (Tr. at 81-82, 155).  Officer Laird testified that he did not see the defendants' vehicle stop at the Clairmont Road intersection, did not see it turn, and did not see whether the driver used his turn signal prior to turning.[23]

---

[22]Officer Summe testified that the defendants' vehicle came to a full stop before turning.  (Tr. at 131).

[23] Officer Laird testified that he was parked next to Officer Summe, and the two were having a conversation at the time the defendants' vehicle exited the airport and turned onto Clairmont Road.  (Tr. at 82).  He said he was looking at Officer Summe at the time, and therefore did not see whether Akselrod used his turn signal.  (Id.).  Officer Summe testified that he did not see a right hand turn signal before, during, or after the defendants' vehicle turned onto Clairmont Road.  (Tr. at 133-34).  Officer Summe testified that Akselrod committed a traffic violation by failing to use his turn signal to turn right while the pickup truck driven by Agent Ascencio was approaching from behind.  (Tr. at 134, 136).  Officer Summe admitted that he did not document this in his report or mention it to Officer Laird because the driver subsequently made a U-turn that both officers thought was illegal, providing probable cause for the stop, and Officer Summe deferred to Officer Laird as the primary officer on the case to determine and document the reason for the stop.  (Tr. at 158, 172, 175).

(Tr. at 81-82).  Officer Laird and Officer Summe pulled out behind the defendants'

vehicle, and began following it on Clairmont Road.  (Tr. at 82).  Officer Laird

testified that he was directly behind the vehicle, and Officer Summe was directly

behind him.  (Id.).  Officer Laird saw the vehicle signal to turn left "almost

immediately" after the officers pulled up behind it, and as the vehicle approached

Dyer Street, it "appeared as though he almost overshot the turn, and then crossed

a double yellow line" to make a U-turn.[24]  (Tr. at 82-83).  Agent Ascencio could not

recall if Akselrod used his turn signal prior to making the U-turn, but Agent

Ascencio described the U-turn as "abrupt," and stated over the radio that he thought

the defendants were "going to run."  (Tr. at 72-73).  At this time, several others

commented over the radio that the defendants' car had made an illegal U-turn in

front of the DCPD marked units.  (Tr. at 73).  Officer Laird made a U-turn behind

the defendants' vehicle, then activated his emergency lights, and the defendants'

_____

[24] Officer Laird testified that he subsequently concluded that the defendants' vehicle had not in fact crossed a double yellow line as he initially believed.  (Tr. at 86-87, 102, 104).   He testified that on the night of the stop, he was "a hundred percent certain that the vehicle crossed over the double yellow line and made an illegal U-turn." (Tr. at 86).  However, upon revisiting the scene during daylight, he "didn't feel confident saying [he] was a hundred percent certain" when he discovered that there was a more sizeable break in the double yellow line at the intersection where the defendants' vehicle made the U-turn.  (Tr. at 87).  Officer Laird also admitted to mistakes in his report regarding the intersection where the U-turn was made: he had mistakenly written in his police report that the U-turn occurred at Clairmont Road and Sixth Street, but he testified that it had actually occurred at Clairmont Road and Dyer Street.  (Id.).

vehicle pulled over.  (Tr. at 87-88).  Officer Summe also made a U-turn and pulled

in behind Officer Laird to assist with the traffic stop.  (Tr. at 135).  Agent Ascencio

did not participate in the traffic stop, and only returned to the scene of the traffic

stop after the car had already been searched.  (Tr. at 73).

Officer Laird contacted the driver of the vehicle, Akselrod, (Tr. at 88-89), and

Officer Summe approached the car from the passenger side.  (Tr. at 137).  As Officer

Laird approached the car, Akselrod "turned around and kind of laughing and joking

said, 'Officer was that U-turn illegal?'" (Tr. at 88, 137).  Officer Laird told Akselrod

that it was, and asked for his driver's license.  (Tr. at 88).  Akselrod gave Officer

Laird a California driver's license with a P.O. Box address on it.  (Id.).  Officer Laird

noticed that Akselrod's "hands were shaking very badly, kind of fidgeting." (Tr. at

89).  He asked Akselrod if he had a Georgia address, and Akselrod told him that he

did, that he had been living in Georgia for six months, but could not say where.  (Tr.

at 89, 138).  Akselrod said he lived close to a medical center, but could not name the

medical center, could not say what street he lived on, the color of his house, or

anything about his residence.  (Id.).  Officer Laird testified that Akselrod "didn't

appear to be homeless," and was a "well dressed, well spoken, intelligent person,"

therefore, the fact that he was unable say where he lived, coupled with the

information he had received about the car before the stop, raised his suspicions that there might be something illegal in the car.  (Tr. at 90).

Officer Laird asked Akselrod if there was anything illegal in the car, and Akselrod said there was not.  (Tr. at 91, 138).  Officer Laird then asked for consent to search the vehicle, and Akselrod refused, saying he did not have anything illegal in the car, but he did not want Officer Laird to search.  (Id.).  Officer Laird then asked Akselrod and Goldenshtein to step out of the vehicle, and he told the defendants that Officer Summe would be "running a K-9 around the vehicle."  (Id.).  Akselrod and Goldenshtein got out of the vehicle, and Officer Laird and Officer Summe patted them down for weapons before seating them, unrestrained, on the curb next to Officer Laird's car.  (Tr. at 92, 138).  By this time, Lt. Wilson and another DCPD officer had arrived at the scene of the stop.  (Tr. at 138).

Officer Summe used Rocky to check the vehicle, and Rocky alerted[25] on the driver's side door, the trunk, and the front passenger side door.  (Tr. at 92, 139-40).  Officer Summe described Rocky's alert at the passenger side door as "strong" and "unusual," and testified that Rocky "began to pull [him] inside the car." (Tr. at 139).

---

[25] Officer Summe testified that Rocky was trained to "alert" and "passively indicate" whenever he detected the odor of narcotics.  (Tr. at 119-20).  Officer Summe described an "alert" as a "change in [the dog's] body posture and breathing when he comes into the odor [on] which he's been trained," and a passive indication "is something that we train [the dog] to do to show us when he has found [the odor]."  (Id.).

18

Because he had gotten the alert, Officer Summe took Rocky off of the leash, and let him go inside the car.  (Id.).  Rocky tried to get in the back seat, but could not because of a large black bag that was there.  (Id.).  Rocky put his nose on the bag, and "indicated" by sitting down on the front seat.  (Tr. at 139-41).  Officer Laird and Officer Summe then handcuffed the defendants and secured them in the back seat of different police cars.  (Tr. at 92).  Officer Summe put Rocky back in his patrol car and proceeded to search the defendants' car.  (Tr. at 93, 141).  Officer Summe opened the black bag in the back seat on which Rocky had indicated, and found that it was filled with vacuum sealed bags of marijuana.  (Tr. at 141, 143).  He testified that he was not able to smell the marijuana until he opened the black bag, and that he was familiar with the smell of marijuana from his training and experience.  (Tr. at 141-42).  Officer Summe opened the trunk and found four more bags containing similarly packaged marijuana.  (Tr. at 142-43).  He estimated that all five bags seized contained approximately 100 pounds of marijuana.  (Tr. at 144).

Officer Laird testified that six to eight minutes elapsed between the time he activated his lights to initiate the traffic stop and the time that Rocky alerted on the vehicle.  (Tr. at 93).  Officer Summe estimated the time as "maybe ten minutes."  (Tr. at 141).  Officer Laird gave Akselrod a DCPD "courtesy warning citation" for the U-

turn violation approximately twenty or thirty minutes after he had been detained. (Tr. at 94).

## II.  DISCUSSION

The defendants' motions to suppress rest entirely on their contention that the traffic stop was illegal.  Therefore, the defendants argue that all the evidence seized from the vehicle, the statements they made after the stop, and the evidence seized from Akselrod's residence pursuant to a search warrant should be suppressed.[26] Because the undersigned finds that the traffic stop was a valid detention supported by reasonable suspicion of criminal activity, defendants' motions are due to be denied.

## A.    Standard for Detention Supported by Reasonable Suspicion

"Temporary detention of individuals during the stop of an automobile by the police, even if only for a brief period and for a limited purpose, constitutes a 'seizure' of 'persons'" for Fourth Amendment purposes.  Whren v. United States, 517 U.S. 806, 809-10 (1996). "Law enforcement agents may briefly detain individuals for purposes of investigating a crime if they have a reasonable, articulable suspicion based on objective facts that the individual has engaged in, or is about to engage in,

---

[26] Defendants argue that the search warrant was obtained with "tainted fruit of the search of the car," and therefore concede that if the traffic stop was legal, the motion to suppress evidence obtained via the search warrant has no basis.  [Doc. 59 at 1, n.1].

criminal activity." United States v. Parker, Criminal Case No. 1:10-CR-0176-JEC-JFK, 2010 WL 5313758, at *4 (N.D. Ga. Nov. 18, 2010), adopted by 2010 WL 5313449, at *1 (N.D. Ga. Dec. 17, 2010) (citing Terry v. Ohio, 392 U.S. 1 (1968); United States v. Harris, 526 F.3d 1334, 1337 (11th Cir. 2008) (per curiam)). "Under the Terry rationale, a law enforcement officer may also conduct a brief investigatory stop of a vehicle, if he is 'able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion.'" Id. (quoting United States v. Benitez-Macedo, 129 Fed. App. 506, 511 (11th Cir. 2005) (per curiam) (unpublished); Terry, 392 U.S. at 21). See also United States v. Webster, 314 Fed. App. 226, 228 (11th Cir. 2008) (per curiam) (unpublished) (a Terry stop "includes the right to stop a moving vehicle, . . . and also includes investigations of past crimes"); United States v. Chanthasouxat, 342 F.3d 1271, 1275 (11th Cir. 2003) ("a traffic stop is a constitutional detention if it is justified by reasonable suspicion under Terry or probable cause to believe a traffic violation has occurred . . .") (citation omitted); United States v. Mikell, 102 F.3d 470, 474 (11th Cir. 1996) ("[T]he police may stop a car and briefly detain it and its occupants in order to investigate a reasonable suspicion that such persons are involved in criminal activity.").

Probable cause must be supported by more than a mere suspicion, but does not require the same "standard of conclusiveness and probability as the facts

necessary to support a conviction." United States v. Dunn, 345 F.3d 1285, 1290 (11th Cir. 2003) (citation omitted). Reasonable suspicion is a less demanding standard than probable cause and requires only a fair probability that illegal activity has occurred. United States v. Sokolow, 490 U.S. 1, 7 (1989). See also United States v. Arvizu, 534 U.S. 266, 274 (2002) (citation omitted) (reasonable suspicion is not formed on a "mere hunch"). In examining the existence of probable cause and reasonable suspicion, the Court looks at the totality of the circumstances confronting the officer. United States v. Trullo, 809 F.2d 108, 111 (1st Cir. 1987). See also Arvizu, 534 U.S. at 273-74. Subjective intentions and motivations are irrelevant, as an officer must have a "'particularized and objective basis for suspecting legal wrongdoing.'" United States v. Lindsey, 482 F.3d 1285, 1290 (11th Cir. 2007) (quoting Arvizu, 534 U.S. at 266); Chanthasouxat, 342 F.3d at 1279-80; United States v. Meyer, 20 Fed. App. 808, 813 (10th Cir. 2001) (unpublished); United States v. Lopez-Valdez, 178 F.3d 282, 288 (5th Cir. 1999). However, "[a] reasonable suspicion of criminal activity may be formed by observing exclusively legal activity." United States v. Gordon, 231 F.3d 750, 754 (11th Cir. 2000) (citations omitted). The Court must "also bear in mind that behavior, seemingly innocuous to the ordinary citizen, may appear suspect to one familiar with the practices of narcotics couriers." United States v. Smith, 201 F.3d 1317, 1323 (11th Cir. 2000) (citations and internal marks omitted).

22

Whether reasonable suspicion exists depends on the "totality of the circumstances in the light of the officers' special training and experience." Id. (citations omitted).

Where, as here, the investigative stop is performed by an officer at the direction of other officers, the Court considers the collective knowledge of all of the officers in determining whether there existed reasonable suspicion. Whiteley v. Warden, Wyo. State Penitentiary, 401 U.S. 560, 568 (1971); see also United States v. Jolly, 368 Fed. App. 17, 19 (11th Cir. 2010) (per curiam) (unpublished) ("'the officer who makes the stop need not be the one who observed the suspicious activities if that information had been relayed to him.'") (quoting United States v. Powell, 222 F.3d 913, 918 (11th Cir. 2000)); United States v. Reed, No. 10-10397, 2010 WL 4146132, at*2 (11th Cir. Oct. 22, 2010) (per curiam) (unpublished) ("the stopping officer is expected to assess the facts in light of his professional experience and where there is at least minimal communications between officers, we look to the collective knowledge of all officers in assessing this determination") (quoting United States v. Kreimes, 649 F.2d 1185, 1189 (5th Cir. July 1981)[27] (internal marks omitted); Mikell, 102 F.3d at 474-75. It is the government's burden to demonstrate that the officer had an objective basis for the stop before initiating it. See Welsh v. Wisconsin, 466 U.S.

_____

[27] Decisions of the Fifth Circuit rendered before October 1, 1981, are binding precedent of the Eleventh Circuit. Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc).

740, 749-50 (1984); United States v. Tobin, 923 F.2d 1506, 1517 n.21, 1520 (11th Cir. 1991) (en banc) (Clark, J., dissenting).

Furthermore, even though an officer may have justification to initiate a traffic stop, the ensuing detention of a vehicle's occupant must not be excessively intrusive in that the officer's actions "must be 'reasonably related in scope to the circumstances which justified the interference in the first place.'" United States v. Boyce, 351 F.3d 1102, 1106 (11th Cir. 2003) (quoting Terry, 392 U.S. at 20). See also United States v. Cantu, 227 Fed. App. 783, 785 (11th Cir. 2007) (per curiam) (unpublished). The stop must be of limited duration and may not last "'any longer than necessary to process the traffic violation' unless there is articulable suspicion of other illegal activity." United States v. Purcell, 236 F.3d 1274, 1277 (11th Cir. 2001) (quoting United States v. Holloman, 113 F.3d 192, 196 (11th Cir. 1997) (per curiam)). The duration of the traffic stop "must be limited to the time necessary to effectuate the purpose of the stop." Id. (citation omitted).

The legality of a detention following a traffic stop may be jeopardized if an officer improperly extends its duration. United States v. Hernandez, 418 F.3d 1206, 1209 n.3 (11th Cir. 2005) (in light of Muehler v. Mena, 544 U.S. 93, 100-01 (2005), proper focus is on the duration, not the scope of questioning). An officer may prolong a stop: (1) to investigate the driver's license and the vehicle registration,

24

including requesting a computer check; (2) while waiting for the results of a criminal history check that is part of the officer's routine traffic investigation; (3) if the officer has "'articulable suspicion of other illegal activity'"; or (4) if the detainee consents. Boyce, 351 F.3d at 1106 & n.3 (quoting Purcell, 236 F.3d at 1277-78).  Thus, where the initial stop is legal, the officer has "'the duty to investigate suspicious circumstances that then [come] to his attention.'"  United States v. Harris, 928 F.2d 1113, 1117 (11th Cir. 1991) (quoting United States v. Hardy, 855 F.2d 753, 757 (11th Cir. 1988)).

**B.    The July 19, 2010, Stop Was Supported By Reasonable Suspicion**

Though defendants go to great lengths to offer innocent explanations for every individual piece of evidence the government cites in support of reasonable suspicion, the whole of reasonable suspicion may be greater than the sum of the parts because it is the totality of circumstances that must be considered, not each individual fact in isolation.  United States v. Bautista-Silva, 567 F.3d 1266, 1272 (11th Cir. 2009) (rejecting a "divide-and-conquer" individualized analysis of individual facts contributing to reasonable suspicion) (quoting Arvizu, 534 U.S. at 273-78).  The complete picture before the DCPD officers and ICE agents involved in the investigation, surveillance, and stop of the defendants was such that a reasonable person viewing the totality of circumstances would suspect that the defendants were involved in smuggling contraband using an airplane.  The government's showing

is buttressed by the fact that most of the officers involved had considerable prior experience conducting narcotics investigations, some of which involved aircraft smuggling of a nature very similar to the case before the Court. See Arvizu, 534 U.S. at 273 (in looking at the totality of circumstances underlying reasonable suspicion, officers may "draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that 'might well elude an untrained person.'") (quoting United States v. Cortez, 449 U.S. 411, 418 (1981)); Bautista-Silva, 567 F.3d at 1275. Agent Martinson and Agent Busby both knew that California Flight Center aircraft had been used in the past to smuggle contraband from southern California airports to the Atlanta area, and they had worked together on a successful interdiction of such a flight roughly a year before. See (Tr. at 11, 38-39). Because of California Flight Center's history and high incidence of narcotics interdictions, Agent Martinson specifically asked for their aircraft to be flagged for his attention if they were encountered operating outside of California. (Tr. at 10-11). Once Goldenshtein's plane had been brought to his attention, Agent Martinson began investigating Goldenshtein's history, which included at least one recent "quick turn" flight. (Tr. at 12, 23-24). He also determined that the same airplane Goldenshtein was flying had made a "quick turn" flight three weeks after Goldenshtein's first flight. (Id.). While such a pattern

of flights might not be suspicious for a charter pilot, Agent Martinson testified that it was suspicious for Goldenshtein considering that he was not authorized to fly charter flights, and his airplane was not registered to do so. (Tr. at 13-14, 23). Goldenshtein also indicated on his Facebook page that he "liked" The Ballast Collective, a medical marijuana growing and distribution group. (Tr. at 15). While this fact standing alone does not give rise to reasonable suspicion, and although the group is legal under California law, it does show that Goldenshtein had at least some interest in or connection to marijuana growing and distribution. All of this information was suspicious enough that Agent Martinson alerted Agent Busby to the possibility that the inbound airplane piloted by Goldenshtein might contain contraband, and Agent Busby set up surveillance to gather more information.

Officer Christian's surveillance added additional facts to the totality of suspicious circumstances. He saw Goldenshtein make a brief phone call after landing, and Akselrod drove up to the airplane almost immediately. The two men unloaded a total of seven bags, five of which did not appear to be ordinary travel luggage. Officer Christian described the bags as larger than what a person might ordinarily carry on a trip out of town. (Tr. at 58). He described the garment bag as "bulky" and observed that Akselrod needed two hands to carry it, which suggested that it contained something other than garments, and based on his experience,

Officer Christian told other agents over the radio that he believed it contained marijuana.  (Id.).  Furthermore, the number of bags unloaded from the plane was more than an ordinary amateur pilot would normally carry, especially considering the weight, balance, and performance issues created by a large amount of luggage, something Officer Christian, Agent Martinson, and Agent Busby were aware of from prior experience.  (Tr. at 15, 33-34, 58-59).  Finally, Officer Chrisitan testified that the fact that the ramp agents did not touch the bags was unusual, but consistent with smuggling activity based on his own first-hand experience.  (Tr. at 58-59).  All of these facts were communicated by radio to the agents and officers participating in the operation, and Officer Laird was instructed to stop the vehicle after it exited the airport, albeit for a traffic offense.

The final suspicious circumstance was Akselrod's sudden U-turn performed when Officer Laird's patrol car pulled in behind him.  Even though the U-turn was not illegal, in view of all of the other factors just listed, such a maneuver taken when marked police units pulled up behind the defendants might reasonably be considered evasive, and yet another indication of criminal conduct.[28]  See United

---

[28] The record shows that Agent Ascencio regarded the maneuver as evasive, and he informed the other agents over the radio that the defendants were "going to run." (Tr. at 72-73).  Indeed, it caught the attention of other law enforcement officers on the scene who also commented over the radio about the vehicle making a U-turn in front of the marked DCPD units.  (Id.).

States v. Sharpe, 470 U.S. 675, 682 n.3 (1985) (where agents "had observed [defendants'] vehicles traveling in tandem for 20 miles in an area near the coast known to be frequented by drug traffickers," defendants' vehicles were "pickup trucks with camper shells [that] were often used to transport large quantities of marihuana," one of the trucks "appeared to be heavily loaded, and the windows of the camper were covered with a quilted bed-sheet material rather than curtains," and "both vehicles took evasive actions and started speeding as soon as [an officer] began following them in his marked car . . . none of these facts, standing alone, would give rise to a reasonable suspicion; but taken together as appraised by an experienced law enforcement officer, they provided clear justification to stop the vehicles and pursue a limited investigation"); United States v. Gopie, 347 Fed. App. 495, 498-500 (11th Cir. 2009) (per curiam) (unpublished) (sufficient reasonable suspicion to detain defendant where officers had an anonymous tip that defendant was engaged in narcotics trafficking, defendant had a prior drug trafficking conviction, officers conducting surveillance on the residence "observed [defendants] carrying uniformly-sized, wooden crates from a U-Haul truck into the Residence," which "appeared to be heavy," as well "large black trash bags, which also appeared to be heavy, from the Residence into an Infiniti vehicle," and defendants made several counter-surveillance maneuvers while driving through traffic before being stopped).

In short, although the government concedes that the U-turn was not in fact illegal, the stop of defendants' vehicle was justified by reasonable suspicion based on information obtained through the agents' collective investigation and surveillance. The investigating agents and officers assembled numerous objective facts and circumstances that, taken together, created more than a mere hunch that the defendants were smuggling contraband. Goldenshtein, who had made at least one recent "quick turn" flight, was flying an aircraft rented from a group with a prior history of supplying airplanes that had been interdicted, from California to Atlanta along a known smuggling route, landed at night near or after the time the flight line was due to close, did not allow ramp agents to touch his bags, which were too bulky, heavy, and numerous to appear to be a normal pilot's luggage, and loaded those bags into a car driven by Akselrod, which appeared minutes after Goldenshtein landed and made a phone call. Once Officer Laird had stopped the defendants, Akselrod's inability to provide his address or describe his Atlanta residence, despite his claim to have lived there for six months, provided additional justification for extending the detention for the purpose of conducting further investigation. This further investigation took place promptly, as Officer Summe and Rocky were at the scene of the stop, and the entire encounter, from traffic stop to the discovery of the marijuana and the defendants' arrest, took place in less than ten

minutes.[29] All of the law enforcement conduct was well within the boundaries of the Fourth Amendment, and therefore defendants' motions to suppress are due to be denied.

Defendants cite a number of "drug courier profile" cases in support of their argument that the law enforcement agents in this case lacked sufficient reasonable suspicion to stop their car.  See [Doc. 59 at 17-18].  However, none of these cases have as many facts supporting reasonable suspicion as are present in the instant case, and furthermore, the detentions in those cases were effected with little or no investigation or surveillance.  The cases cited involve, as defendants state "detentions of travelers based on profile characteristics by law enforcement agents at airports and bus stations," [Doc. 59 at 17], and show the same general pattern in which one or two officers consensually contact a person that they believe might fit a drug courier profile, question that person to try to develop additional basis to detain them, and either conduct a pat-down or ask for consent to search the person's

---

[29] This amount of time was reasonable considering the circumstances, especially in light of the fact that the Eleventh Circuit has upheld lengthier detentions.  See Hardy, 855 F.2d at 759 (upholding a 50 minute traffic stop until arrival of narcotics dog while noting, "in distinguishing a true investigative stop from a de facto arrest, we must not adhere to 'rigid time limitations' or 'bright line rules,'. . . but must use 'common sense and ordinary human experience.'") (quoting Sharpe, 470 U.S. at 685); United States v. Gil, 204 F.3d 1347, 1251 (11th Cir. 2000) (per curiam) (upholding 75 minute investigatory detention on grounds that "police were diligent in their investigation of the residence and did not detain [defendant] without formally arresting her for any amount of time longer than it was necessary to complete that investigation").

luggage.[30]  The instant case does not present an analogous scenario, and therefore these cases, while not entirely inapposite, are not particularly illuminating as to whether the officers had reasonable suspicion for the stop in this case.

---

[30] See United States v. Fletcher, 91 F.3d 48, 51 (8th Cir. 1996) (no reasonable suspicion to detain defendant for drug dog sniff where "(1) [defendant] arrived from Phoenix, a drug source city; (2) he was first off the plane (3) and proceeded directly to the restroom; (4) he was connected to a white pick-up truck with supplemental gas tanks and Arizona license plates; (5) he told the police he had a round trip ticket when the officers believed he had a one way ticket purchased with cash; (6) [defendant] withdrew his consent after initially agreeing to a search; and (7) he was associated with a woman at a local address where a narcotics complaint had been made."); United States v. Green, 52 F.3d 194, 198 (8th Cir. 1995) (no reasonable suspicion to detain defendant for drug dog sniff where "(1) [defendant] arrived on an airplane from Phoenix, a known drug source city; (2) [defendant] appeared to be conducting counter-surveillance; (3) [defendant] appeared 'incredibly nervous' to the point that [the officer] felt she might run; (4) [defendant] failed to produce a plane ticket or identification; and (5) [defendant] was vague about the purpose of her trip" but noting that "[t]he case before us is an extremely close one"); United States v. O'Neal, 17 F.3d 239, 242 (8th Cir. 1994) (insufficient reasonable suspicion to justify detaining a bus passenger from Chicago consensually contacted by police who appeared nervous and was carrying an athletic bag); United States v. Wilson, 953 F.2d 116, 120 (4th Cir. 1991) (no reasonable suspicion to detain airline passenger in airport based only on "(1) [defendant's] arrival from New York, a 'known source city' for drugs; (2) [defendant's] eye contact with the agent, looking back up to three times as he was riding the escalator, and turning and looking directly at [the officer] as he [defendant] reached the top; (3) [defendant's] false statement that he was coming from Boston; (4) [defendant's] failure to produce any identification other than a check-cashing card; and (5) [the officer's] observation of a bulge in [defendant's] coat pocket.); United States v. Clardy, 819 F.2d 670, 673 (6th Cir. 1987) (detention not justified where based only on the fact that defendant was traveling from Miami, was traveling with another man, and was last to deplane, even though these factors "arguably fit certain characteristics of the drug courier profile."). Defendants also cite United States v. Millan, 912 F.2d 1014 (8th Cir. 1990), which has similar facts to the above cases, but is no longer good law.  See United States v. Gilbert, 936 F.2d 377, 378  (8th Cir. 1991) (per curiam).

Defendants also cite a number of highway smuggling cases that, while more analogous to the case at bar, all have much weaker factual bases for the detaining officers' reasonable suspicion than is present here.  For example, in United States v. Tapia, 912 F.2d 1367, 1371 (11th Cir. 1990), the Eleventh Circuit concluded that "being Mexican, having few pieces of luggage, being visibly nervous or shaken during a confrontation with a state trooper, or traveling on the interstate with Texas license plates . . . doe[es] not provide a minimal, particularized basis for a conclusion of reasonable suspicion."  Defendants also cite United States v. Rangel-Portillo, 586 F.3d 376, 379 (5th Cir. 2009), a Border Patrol stop in which the defendant was detained on suspicion of alien smuggling where officers observed defendant's vehicle exit a Wal-Mart parking lot in tandem with another vehicle in very close proximity to the border and the passengers had no shopping bags, were "sweaty," did not converse, "sat rigidly," and did not make eye contact with the officer.  Cf. also, United States v. Laughrin, 438 F.3d 1245, 1248-49 (10th Cir. 2006) (no reasonable suspicion to stop driver where officer knew from prior contact that defendant's driver's license had been suspended 22 weeks earlier); United States v. Valenzuela, 365 F.3d 892, 897 (10th Cir. 2004) ("when we strip away the rhetoric we have only two facts-both vehicles had Arizona plates and both were heading toward Arizona on an Interstate highway"); United States v. Perkins, 348 F.3d 965, 970 (11th Cir. 2003) (after warning ticket was issued, no reasonable suspicion to continue detaining

33

passenger and driver based solely on their nervousness and inconsistent statements); United States v. Townsend, 305 F.3d 537, 544 (6th Cir. 2002) (no reasonable suspicion to continue detention of defendant enroute from Chicago to Columbus at night who claimed to be going to his sister's house, had a roll of cash in his pocket, and a Bible, three cellular phones, food wrappers in the back seat, was not the registered owner of the car, and appeared nervous); United States v. Beck, 140 F.3d 1129, 1137 (8th Cir. 1998) (no reasonable suspicion to justify continued detention where defendant was "(1) . . . driving a rental car which had been rented by an absent third party; (2) the [car] was licensed in California; (3) there was fast food trash on the passenger side floorboard; (4) no visible luggage in the passenger compartment of the automobile; (5) [defendant had a] nervous demeanor; (6) [defendant's] trip [was] from a drug source state to a drug demand state; and (7) [the officer disbelieved defendant's] explanation for the trip").[31]

The vehicle stop cases defendants cite, like the airport and bus station "drug courier profile" cases, are distinguishable in that the detentions were not a result of the type of background investigation and surveillance present in this case.  They are

---

[31] Defendants also cite United States v. Espinoza, 490 F.3d 41 (1st Cir. 2007); United States v. Jones, 149 F.3d 364 (5th Cir. 1998); United States v. Salzano, 158 F.3d 1107 (10th Cir. 1998); United States v. Wood, 106 F.3d 942 (10th Cir. 1997); United States v. Garcia, 23 F.3d 1331 (8th Cir. 1994); and United States v. Rodriguez, 976 F.2d 592 (9th Cir. 1992), but none are binding on this Court or present facts that are significantly different from the other cases discussed.

also distinguishable in that the facts known or observed by officers in the instant

case provided a significantly stronger indication that there was a fair probability

illegal activity was afoot.  Officer Laird's stop of defendants' vehicle was not, unlike

the cases defendants cite, a stop based on a "hunch" or pretext because the

defendants matched certain characteristics of a drug courier profile.  Rather, based

on his experience investigating the use of aircraft to smuggle narcotics, Agent

Martinson identified Goldenshtein as the pilot of a plane connected to a flight center

in California that had previously leased interdicted aircraft, and he investigated

Goldenshtein's background and aviation history, and contacted Agent Busby who

set up surveillance that observed the defendants meet in a small airport at night,

offload an unusually large number of bulky bags after instructing the ramp agents

not to touch the bags, and drive away.  Furthermore, when marked patrol units

pulled behind the defendants, they executed a sudden U-turn.[32]  Not one case cited

by defendants in support of their motions presents even close to as solid a

---

[32] Defendants distinguish <u>Gopie</u> by pointing out that, in the instant case, there was no anonymous tip, no prior drug trafficking offense, and no counter-surveillance maneuvering.  [Doc. 59 at 26-27].  However, none of these individual factors are essential to establish reasonable suspicion to stop an individual suspected of narcotics trafficking, and officers in this case had adequate reasonable suspicion based on the other facts and circumstances discussed.  Similarly, defendants' distinguishing of <u>Jolly</u> on the factual differences between that case and the instant case is of no moment because it is the principles underlying the reasoning in <u>Jolly</u> upon which the government relies, not the presence or absence of any particularly suspicious fact present in that case but not here without which reasonable suspicion is eviscerated.

foundation for reasonable suspicion as is present here.

Defendants argue that the fact that Officer Laird was instructed to stop defendants for a traffic violation indicates that the officers believed they lacked a lawful basis to detain defendants. [Doc. 59 at 25]. However, this argument is flawed because the subjective intentions and opinions of the officers are irrelevant to the Court's determination of whether the officers, in fact, had reasonable suspicion to stop the vehicle. See United States v. Mwangi, Criminal File No. 1:09-CR-107-TWT, 2010 WL 520793, at *3 n.9 (N.D. Ga. Feb. 5, 2010), adopted at *1 (citing Devenpeck v. Alford, 543 U.S. 146, 153-56 (2004); Lindsey, 482 F.3d at 1292 nn.4-5). See also Miller v. Harget, 458 F.3d 1251, 1260 (11th Cir. 2006) ("It is well-settled that an officer's subjective motivations do not affect whether probable cause existed") (citing Whren, 517 U.S. at 813; Arkansas v. Sullivan, 532 U.S. 769, 771-72 (2001); Durruthy v. Pastor, 351 F.3d 1080, 1088 n.5 (11th Cir. 2003)); United States v. Jimenez, No. 2:06-cr-74-FtM-29DNF, 2006 WL 2927477, at *2 (M.D. Fla. Oct. 11, 2006) (holding that "an officer's belief that he has probable cause or does not have probable cause is simply not a pertinent factor" in determining whether an arrest is lawful). Moreover, defendants' argument erroneously presumes that officers must make a stop immediately upon having the bare minimum threshold of reasonable suspicion. The fact that the officers elected to look for a traffic offense to support a stop does not preclude finding that they had reasonable suspicion for a Terry stop.

See Whren, 517 U.S. at 812-813 (citing United States v. Robinson, 414 U.S. 218, 221 (1973)).

Finally, defendants argue that the collective knowledge doctrine does not apply because Officer Laird and Officer Summe did not have all of the knowledge and information gathered by Agent Martinson, Agent Busby, and Officer Christian. However, the record shows that Agent Busby relayed all of the information he had gathered to the agents and officers present at the briefing held before the plane landed.  Whether or not Officer Laird and Officer Summe were present for this briefing, Lt. Wilson, their supervisor, attended the briefing, remained with Agent Busby at the briefing site, and remained in radio contact with both Agent Busby and with Officers Laird and Summe as the events up to the stop unfolded.  This degree of communication is certainly more than "minimal," and the collective knowledge doctrine therefore applies. See Reed, 2010 WL 4146132, at *2 ("[t]he stopping officer is expected to assess the facts in light of his professional experience and where there is at least minimal communications between officers, we look to the collective knowledge of all officers in assessing this determination") (quoting Kreimes, 649 F.2d at 1189 (internal marks omitted) (alteration in original)).

Additionally, though Officer Laird was instructed to look for a traffic offense to stop the defendants' vehicle, he was not unfamiliar with the underlying reason

the ICE agents were surveilling the defendants as defendants' brief suggests.[33]  The

record reflects that he knew at the time of the stop that ICE agents suspected that

defendants were smuggling narcotics by airplane, that they wanted his assistance

with making the stop, that the plane associated with the defendants had landed at

night shortly before the stop, that the pilot was met by the driver of a vehicle that

was described to him via radio, that ICE agents had conducted surveillance on the

plane and the vehicle, that they wished for him to stop the vehicle as it left the

airport, that a vehicle matching the description given by the ICE agents left the

airport at exactly the time given, and that the vehicle made a sudden U-turn almost

immediately after Officer Laird pulled in behind it.  Cf.  Jolly, 368 Fed. App. at 19;

Gopie, 347 Fed. App. at 498-99 (involving similar circumstances where the stop of

defendant was made by a different officer than the officers conducting surveillance);

Kreimes, 649 F.2d at 1190 (stop of blacked out vehicle upheld where officer was

informed via radio broadcast of "a large, low-flying inland bound aircraft flying

without navigational lights which was suspected of being a smuggler," and the

vehicle was stopped "traveling after midnight, at a slow rate of speed, with its lights

off, down a road leading from the area where a suspected smuggling plane had

---

[33] See [Doc. 59 at 29 ("these uniformed officers [did not] detain the defendant because they were directed to do so by their agency or their supervisor based on the existence of sufficient information to do so.  They detained the defendants for an entirely different (and now known to be illegitimate) reason: a supposed traffic infraction")].

landed"). As in <u>Kreimes</u>, Officer Laird's stop was not a "haphazard casting of the net by a police officer which snared a criminal violation, rather it was an action founded upon sound basis which foiled exactly the activity suspected." <u>Id.</u> Defendants have failed to cite any authority that suggests that the collective knowledge doctrine should not apply to the circumstances of this case, and their motions to suppress are due to be denied. Accordingly, it is **RECOMMENDED** that defendants' motions to suppress evidence seized during the July 19, 2010, traffic stop, [Docs. 30 & 37], be **DENIED**.

**C.    The Search Warrant for Goldenshtein's residence was untainted.**

Goldenshtein also moves to suppress evidence seized from his residence in California pursuant to a search warrant on the basis that "the evidence used to support probable cause for the search of [his] residence was obtained solely as a result of the illegal search and seizure of [his]vehicle and person after his car was illegally stopped." [Doc. 36 at 9]. However, Goldenshtein's "fruit of the poisonous tree" argument fails because the vehicle stop was not illegal for the reasons already discussed. <u>See also</u> [Doc. 59 at 1, n.1 (conceding "if the automobile search is upheld, the defendants acknowledge that the search warrant searches are also valid")]. Accordingly, it is **RECOMMENDED** that Goldenshtein's motion to suppress evidence seized from the search of his residence, [Doc. 36], be **DENIED**.

**D.      Akselrod's Motion for a Bill of Particulars**

Akselrod has filed a motion for a bill of particulars to require the government to provide certain information with regard to the charges in the indictment.  [Doc. 38].  Specifically, Akselrod wants to know the date on which the alleged conspiracy began, the identities of the "other persons known ... to the Grand Jury," and the specific amount of marijuana allegedly possessed with the intent to distribute.  [Id. at 1-2].  Akselrod also seeks additional details about the  specific amount of money and the identity of the property that the government contends is subject to forfeiture. [Id. at 2].

Rule 7(f) of the Federal Rules of Criminal Procedure provides that the Court "may direct the government to file a bill of particulars."  Fed. R. Crim. P. 7(f).  The purpose of a bill of particulars is to inform defendants of the charge against them in sufficient detail to permit adequate defense preparation and to minimize surprise at trial.  United States v. Colson, 662 F.2d 1389, 1391 (11th Cir. 1981); United States v. Diecidue, 603 F.2d 535, 563 (5th Cir. 1979).  Generalized discovery is not a valid reason for seeking a bill of particulars.  Colson, 662 F.2d at 1391; United States v. Davis, 582 F.2d 947, 951 (5th Cir. 1978).  Further, a defendant is not entitled to a bill of particulars describing information which is already evident from other sources, such as elsewhere in the indictment or in discovery.  United States v. Rosenthal, 793 F.2d 1214, 1227 (11th Cir. 1986).

"A bill of particulars may not be used to compel the government to provide the essential facts regarding the existence and formation of a conspiracy." Id. A bill of particulars cannot be used to ferret out additional overt acts not listed in the indictment, as long as the indictment alleges the required number of overt acts under the statute being charged. See id.; Colson, 662 F.2d at 1391; United States v. Kilrain, 566 F.2d 979, 985 (5th Cir. 1978). "As applied to a charge of conspiracy, . . . the view virtually universally held is that the defendant is not entitled to particulars regarding the formation of the conspiracy; [the] exact time and place of overt acts and the names and addresses of persons present; the details concerning how and when the conspiracy was formed or when each participant entered the conspiracy." United States v. Upton, 856 F. Supp. 727, 753 (E.D.N.Y. 1994). See also United States v. Leiva-Portillo, No. 1:06-CR-350-WSD, 2007 WL 1706351, at *15 (N.D. Ga. June 12, 2007), adopted at *1. Additionally, the "'government is not required to list all forfeitable interests in the indictment, provided the indictment notifies defendants that the government will seek to forfeit all property acquired [as a result of the] violation.'" United States v. Diaz, 190 F.3d 1247, 1258 (11th Cir. 1999) (quoting United States v. DeFries, 129 F.3d 1293, 1315 (D.C. Cir. 1997)).

In response to a motion for a bill of particulars filed by Goldenshtein, [Doc.

31],[34] the government has already stated that "the government believes that the conspiracy began on or about March 1, 2010," [Doc. 35 at 1].  As for Akselrod's request for disclosure of the identities of persons who are co-conspirators or aiders and abettors "known ... to the Grand Jury," the Court finds that Akselrod is entitled to such information in order to adequately prepare for his defense and avoid surprise.  The government is therefore **ORDERED** to disclose to Akselrod the identity of persons who are known co-conspirators or aiders and abettors.  However, the remaining information sought by Akselrod is beyond the proper scope of a bill of particulars.  See United States v. Sherriff, 546 F.2d 604, 606 (5th Cir. 1977) ("The purpose [of a bill of particulars] is not to provide detailed disclosure before trial of the Government's evidence."); United States v. Esteves, 886 F. Supp. 645, 646 (N.D. Ill. 1995) (evidentiary detail sought by defendant beyond proper scope of bill of particulars); United States v. Henry, 861 F. Supp. 1190, 1197 (S.D.N.Y. 1994) (requests to know the "whens," "wheres," and "with whoms" of acts in conspiracy are routinely denied); United States v. Lobue, 751 F. Supp. 748, 756 (N.D. Ill. 1990) ("Requests for a list of witnesses or other evidentiary details as to when and where conversations took place are not within the scope of a bill of particulars."); United States v. White, 50 F.R.D. 70, 71-72 (N.D. Ga. 1970).  Accordingly, Akselrod's motion

---

[34] Goldenshtein's motion for bill of particulars, [Doc. 31], was granted in part and denied in part at the pretrial conference on August, 18, 2010, see [Doc. 34].

requesting particulars concerning the date on which the alleged conspiracy began, the specific amount of marijuana allegedly possessed, the specific amount of money and the identity of the property subject to forfeiture, is **DENIED**.

### III.  CONCLUSION

For the foregoing reasons and cited authority, the motion for a bill of particulars, [Doc. 38], is **GRANTED** in part and **DENIED** in part, and it is **RECOMMENDED** that defendants' motions to suppress evidence, [Docs. 30, 36 & 37], be **DENIED**.

There are no other pending matters before the Magistrate Judge, and the undersigned is aware of no problems relating to the scheduling of this case.

**IT IS THEREFORE ORDERED** and **ADJUDGED** that this action be and the same is hereby, certified Ready for Trial.

**IT IS SO ORDERED AND RECOMMENDED**, this 22nd day of February, 2011.

_Russell G. Vineyard_
RUSSELL G. VINEYARD
UNITED STATES MAGISTRATE JUDGE